UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY WILLIAMS-TURK,

    Plaintiff,

v.

SGT. CHARLES BAZZY AND OFFICER
LOUANN HAMBLIN,

    Defendants.
    _____/

Case No. 09-14786

Honorable Nancy G. Edmunds

**OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [19]**

This action, alleging a Fourth Amendment violation for excessive force against Defendants Bazzy and Hamblin, is brought pursuant to 42 U.S.C. § 1983. It arises from an incident that occurred in the early morning hours of January 21, 2008. Plaintiff Mary Williams-Turk alleges that Defendants Bazzy and Hamblin violated her Fourth Amendment rights by using excessive force after she was handcuffed. Specifically, Plaintiff alleges that after Defendants put handcuffs on her that were too tight, they then pulled her off her porch by the handcuffs and also yanked her up to her feet by the handcuffs when she began to fall. Plaintiff further alleges that, as a result of Defendants' use of excessive force, she suffered a right wrist fracture that required casting, physical therapy, and ultimately surgery. This matter is now before the Court on Defendants' motion for summary judgment arguing that there was no Fourth Amendment violation and that Defendant Officers are entitled to

qualified immunity on Plaintiff's Fourth Amendment excessive force claim. For the reasons stated below, Defendants' motion is DENIED.

**I.    Facts**

On January 20, 2008, Plaintiff was hosting a going-away party at her home on Winding Pond Lane in Van Buren Township. The party was for her son, Dominique Scott Williams, who had enlisted in the military and was scheduled to leave home within a few days. (Pl.'s Dep. at 13-15.) Family and friends began arriving around 2:00 p.m. and food and drinks were served to the guests. Plaintiff testified that she drank approximately two glasses of wine between 2:00 p.m. and 9:00 p.m. (Pl.'s Dep. at 20.)

Viewing the facts in the light most favorable to the Plaintiff (the non-moving party), there were about eight to ten people, including Plaintiff, still present at her home when Defendant Officers arrived. Most were sitting in the basement, relaxing and cleaning up. (Pl.'s Dep. at 19-20.) One of the guests called down to her, telling her to come upstairs. Once upstairs, Plaintiff saw two police officers inside her home, halfway between the foyer and the library. The two officers were Defendants Hamblin and Bazzy. (*Id.* at 21-22.)

Plaintiff greeted Defendants, told them her name, and identified herself as the home owner. She also asked Defendants for their identification and inquired who let them into her home and what was going on. Defendants replied that it was her son, Tommy Williams (age 21) and his girlfriend Lori McGlone (age 17) who let them into her house. Defendants explained that they were responding to a neighbor's call about a female walking around the neighborhood in the cold without a coat and crying, had arrived on Plaintiff's street and

2

discovered 17-year old Lori McGlone who had apparently been drinking,[1] was upset, and out in the cold without a coat. (*Id.* at 9, 22-24, 30.) Lori had told Defendants that she got into an argument with her boyfriend and left his house in tears and without her coat. (Pl.'s Ex. 3, Hamblin 1/21/08 incident report at 1.)

Defendants began interrogating Plaintiff because Lori had been drinking. Plaintiff told them that if Lori had been drinking, she "stole it" from Plaintiff; Plaintiff did not serve her or anyone underage. (Pl.'s Dep. at 23-24.) In response to Defendants' request, Plaintiff went to get her ID from her purse which was in a kitchen cupboard. At this time, Defendant Officers were tracking snow and mud throughout Plaintiff's home, and Defendant Bazzy, without permission, started going through Plaintiff's cupboards and other possessions in Plaintiff's great room. Plaintiff told him to quit. She was upset that officers were in her home without her permission, were tracking mud and snow throughout her home, and were ignoring her questions. (*Id.* at 24-27.)

Plaintiff went back to the foyer area and handed Defendant Hamblin her ID. Then her front door burst open again and another officer walked into her home. Officer Kapchus from the Belleville Police Department had arrived in response to a call for back up. Plaintiff identified herself to this officer and asked for his identification because his jacket was zipped up and his identification was covered up. He replied, "I don't have to tell you shit." (*Id.* at 27-28.) It was a bitter cold night, so Plaintiff asked the officer to either come in or stay out but close the door. (*Id.* at 28.)

---

[1]The police report reveals that a preliminary breath test performed on Lori that night in the police car showed .056% alcohol. (Pl.'s Ex. 3, Hamblin 1/21/08 incident report at 1.)

3

The next thing Plaintiff knew, Defendant Bazzy with the help of another police officer pulled her son Tommy outside and threw him on the ground. He was bloody and lying face down with police surrounding him. Plaintiff had no idea why her son was being dragged out of the house and tackled on her front lawn. The officers did not tell her that he was being arrested. (*Id.* at 29, 32-33, 40.) Defendant Hamblin's incident report states that after Tommy Williams provided the officers with his identification, they ran a lien check on him that revealed several misdemeanor warrants, and they arrested him on those outstanding misdemeanor warrants. (Pl.'s Ex. 3, Hamblin 1/21/08 incident report at 2.)

After seeing her son pulled out of the house and thrown to the ground, Plaintiff called her sister who is a retired police officer, asking her if the police can just walk into her home, pull her son out, and tackle him to the ground. Plaintiff also told her son that she was going to call an attorney. She walked out of her home, down two porch steps, and attempted unsuccessfully to reach an attorney she knew. After this unsuccessful attempt, Plaintiff went back onto her porch and attempted to get back into her home because it was bitter cold and she wanted her coat. The third officer on the scene, Officer Kapchus, was leaning on the doorknob, blocking her entry. (Pl.'s Dep. at 29-34.) She said, "Excuse me, let me get my jacket," and the officer replied, "You're not going anywhere." (*Id.* at 34.) The officer would not let her enter her home to get her coat, so her son who was about to enter the military, Dominique, went to open the front storm door from the inside and give his mother her coat. Officer Kapchus slammed his body against the door, catching Dominique's arm in the storm door, and preventing him from giving Plaintiff her coat. (*Id.* at 34-36.) Officer Kapchus then started yelling, "Ouch, she's hurting me. She's hurting me." (*Id.* at 36.) Plaintiff replied, "Stop it. I'm not hurting you." (*Id.*) Plaintiff was on the other side of the

4

porch, just looking at Officer Kapchus as he yelled this and banged himself against the doorknob. (*Id.* at 36-37.) Next, Plaintiff heard Defendants Hamblin and Bazzy, who were now outside, say that they should arrest Plaintiff for hurting Officer Kapchus. (*Id.* at 37-38.) Then, Defendant Hamblin came up to Plaintiff, told her that she was hurting the police officer, and handcuffed her. (*Id.* at 41.) According to Defendant Hamblin's incident report, Defendants Hamblin and Bazzy, along with another officer, handcuffed Plaintiff while she was on her porch. (Pl.'s Ex. 3, Hamblin 1/21/08 incident report at 2.)

Plaintiff testified that when she was handcuffed, the cuffs were put on too tight. Also, after being handcuffed, Defendant Officers started pulling and yanking her off her porch by the handcuffs. (Pl.'s Dep. at 42-43.) Plaintiff started to fall because it was winter, it was cold and there was snow. As she started to fall, Defendant Officers "yanked [her] up by the handcuffs." (Pl.'s Dep. at 44.) Defendant Officers broke her fall "by pulling [her] up with handcuffs." (*Id.*) On the video provided by Defendants, Plaintiff can be heard screaming in pain while handcuffed. (Def.'s Ex. 3, DVD.) Plaintiff testified that after being handcuffed by Defendant Hamblin, Defendant Bazzy seemed to take over. (Pl.'s Dep. at 55.)

As Plaintiff was dragged across her lawn toward the police car, she kept telling Defendant Officers that the handcuffs were too tight and that her arm was hurting. (*Id.* at 45.) Defendant Bazzy kept telling Plaintiff, "Shut the fuck up, and, Bitch." (*Id.* at 45-47.) Defendant Bazzy loosened the handcuffs after another officer said, "Sarg, you got to loosen them. You're hurting her. You're hurting her." (*Id.*) At 1:02:43 a.m., the video shows Plaintiff asking to have her handcuffs loosened; and at 1:03:18 a.m., another officer adjusted them. Plaintiff was then placed in the back of a police car, transported to the police station, and booked on the following misdemeanor charges: (1) assault and battery

5

of a police officer; (2) furnishing alcohol to a minor; and (3) obstructing justice. While being fingerprinted, Plaintiff asked the police to take it easy and asked for medical attention because her right arm was swollen and black and blue. No one was called, and Plaintiff was taken to lock-up and detained until between 7 a.m. and 9 a.m. that same day. (Pl.'s Dep. at 50-51, 53, 56-57.)

On January 21, 2008 at 9:29 a.m., Plaintiff was treated at Western Wayne Urgent Care for injuries to her right wrist. An orthopedic surgeon diagnosed a fractured right wrist. Plaintiff's right wrist was casted twice during a four and one-half week period. Plaintiff then had aggressive physical therapy at her surgeon's recommendation. During a recheck in mid-April 2008, Plaintiff's surgeon diagnosed her with cubital tunnel of the right hand and a right wrist ligament tear. Plaintiff ultimately had surgery for cubital tunnel release on July 6, 2010. (Pl.'s Ex. 2, medical records; Pl.'s Dep. at 58-64, 71-72.)

As to the three misdemeanor charges resulting from the January 21, 2008 incident, Plaintiff entered a nolo contendere plea to the furnishing of alcohol to a minor on March 4, 2008. She was required to pay a fine and court costs, the matter was taken under advisement for six months (delayed sentence); and at the end of that six-month period, the charge was dismissed. (Defs.' Ex. 4; Pl.'s Dep. at 58.) The other two charges for assault and battery on a police office and obstructing justice were dismissed without a plea or payment of any fine or costs. (Defs.' Exs. 5 and 6; Pl.'s Dep. at 58.)

Plaintiff filed the complaint in this action on December 8, 2009.

## II. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A moving party may meet that burden "by 'showing'-that is, pointing out to the district court- that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). When the moving party has met its burden under rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. of Educ.*, 286 F.3d 366, 370 (6th Cir. 2002).

### III.  Analysis

Defendants move for summary judgment arguing that (1) the force used on Plaintiff was reasonable because her handcuffs were immediately loosened after she complained that they were too tight; and (2) Defendants are entitled to qualified immunity on Plaintiff's Fourth Amendment excessive force claim. The Court begins its analysis with Defendants' qualified immunity arguments.

#### A.  Qualified Immunity

In a recent decision, the Sixth Circuit addressed qualified immunity in the context of a § 1983 excessive force case. *See Grawey v. Drury*, 567 F.3d 302 (6th Cir. 2009). It began, as this Court does, with a discussion of the doctrine of qualified immunity and how the Court determines whether a defendant is entitled to the protection afforded by that doctrine.

The doctrine of qualified immunity shields "'government officials performing discretionary functions'" from "'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 309 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). On summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party; Plaintiff in this case. Viewing the facts in that light, the Court must then determine "whether: 1) the violation of a constitutional right has occurred; and 2) the constitutional right at issue 'was clearly established at the time of defendant's alleged misconduct.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), and citing *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004)). Although the Supreme Court, in *Pearson v. Callahan*, ___ U.S. ___, 129 S. Ct. 808, 818 (2009), recently held that the courts now have discretion to address the second step first when appropriate, this Court, similar to the Sixth Circuit in *Grawey v. Drury*, will first examine whether Plaintiff has presented evidence of a constitutional violation. *Grawey*, 567 F.3d at 309.

**B. Excessive Force**

Defendants argue that, under prevailing Sixth Circuit precedent, there can be no Fourth Amendment claim for excessive force under the facts presented here where Plaintiff's handcuffs were immediately loosened after she complained to Defendant Officers that they were too tight. In support, Defendants rely on *Miller v. Sanilac County*, 606 F.3d 240, 252 (6th Cir. 2010); *Burchett v. Kiefer*, 310 F.3d 937, 945 (6th Cir. 2002); and *Fettes v. Hendershot*, 375 F. App'x. 528, 533 (6th Cir. 2010).

In *Miller*, the Sixth Circuit observed that, although "[t]he Fourth Amendment prohibits unduly tight or excessively forceful handcuffing during the course of a seizure," to survive summary judgment on a handcuffing claim, "a plaintiff must offer sufficient evidence to create a genuine issue of material fact that: (1) he or she complained that the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced some physical injury resulting from the handcuffing." *Id.* (internal quotation marks and citation omitted). *See also Vance v. Wade*, 546 F.3d 774, 783 (6th Cir. 2008) (holding that the defendant officer did not violate the plaintiff's constitutional rights because the handcuffs were removed when Wade learned of the plaintiff's complaints); *Burchett v. Kiefer*, 310 F.3d at 945 (same). *Cf. Fettes v. Hendershot*, 375 F. App'x at 533 (finding that the defendant officers were entitled to qualified immunity because "a reasonable officer would not know that the failure to respond to a complaint about tight handcuffs during a ten-minute ride to the police station violates the Constitution."). Defendants argue that because Plaintiff cannot establish that Defendants ignored her complaints that her handcuffs were too tight, she cannot establish a Fourth Amendment violation for use of excessive force.

The Court's task is to evaluate Defendants conduct "under the Fourth Amendment's 'objective reasonableness' standard." *Roberts v. Manigold*, 240 F. App'x 675, 677 (6th Cir. 2007) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004)). Under the Fourth Amendment, a police officer may use only such force as is objectively reasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Determining whether there has been a Fourth Amendment violation requires consideration of "the severity of the

9

crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. "The Court should judge the lawfulness of the conduct from the 'perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight.'" *Morrison v. Bd. of Tr. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (quoting *Graham*, 490 U.S. at 396).

Defendants' arguments ignore that Plaintiff's claim involves more than a mere tight handcuff claim. Specifically, Plaintiff claims that Defendants used excessive force on her <u>after</u> she was handcuffed -- by pulling her off the porch by her handcuffs and by yanking and pulling her up to her feet by her handcuffs as she started to fall off the porch.[2] *See Morrison*, 583 F.3d at 401 (observing that "[a] reviewing court analyzes the subject event in segments when assessing the reasonableness of a police officer's actions.").

Viewing the facts in the light most favorable to Plaintiff and applying the above three *Graham* factors, Defendants' use of force was not objectively reasonable. First, Plaintiff was charged with three misdemeanors; not serious felony charges. Second, Defendants present no facts showing that, <u>after</u> Plaintiff was handcuffed, she posed an immediate threat to the safety of the officers or others. Finally, Plaintiff testifies that she was not actively resisting arrest or attempting to evade arrest by flight. It is objectively unreasonable to use physical force on a person under these facts. *See Morrison*, 583 F.3d at 404 (observing that the Sixth Circuit "has consistently held in light of the reasonableness

---

[2] Despite Defendants' argument to the contrary, Plaintiff's deposition testimony can be viewed as including Defendant Hamblin in this conduct. (Pl.'s Dep. at 55.)

10

standard that 'use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law.'") (quoting *Baker v. City of Hamilton*, 471 F.3d 601, 607-09 (6th Cir. 2006)). *See also Vance*, 546 F.3d at 783-84 (concluding that the defendant officer's "pulling up on" the plaintiff's "handcuffs while his hands were cuffed behind his back" and shoving and throwing the plaintiff into a police car "could constitute an excessive use of force"); *Polk v. Hopkins*, 129 F. App'x 285, 287, 290-91 (6th Cir. 2005) (finding that "a jury question existed" as to whether the force the defendant officer used on the plaintiff was reasonable and further determining that the defendant officer was not entitled to qualified immunity when he "allegedly jerked [the plaintiff] up by the handcuffs and pushed her into the police car" after she had already been handcuffed). Taking the evidence in the light most favorable to Plaintiff but viewing it from the perspective of a reasonable officer on the scene, Plaintiff's evidence establishes an excessive force claim against Defendants.

### C. Violation of Clearly Established Right

The Court now considers Defendants' arguments that, even if they did violate Plaintiff's Fourth Amendment right to be free from excessive force, they are entitled to qualified immunity because a reasonable officer in their position would not have known that pulling Plaintiff off her porch by her handcuffs and yanking her up to her feet by the handcuffs when she began to fall violated the Fourth Amendment of the Constitution. This Court disagrees.

Viewing the facts in the light most favorable to the Plaintiff, at the time of Defendants' challenged conduct, she was handcuffed and thus did not pose a risk to the safety of the officers or others. Plaintiff also testified that she was not resisting arrest and was not

attempting to flee. She had been neutralized, and there was no need for Defendants' gratuitous use of force in moving her off her porch and in breaking her fall when being moved off that porch. As the *Morrison* court recently observed, "in this Circuit, the law is clearly established that an officer many not use additional gratuitous force once a suspect has been neutralized." *Morrison*, 583 F.3d at 408 (internal quotation marks and citations omitted). It is immaterial that the facts presented here differ somewhat from those in the decisions discussed above. "[T]here need not be a case with the exact same fact pattern or even fundamentally similar or materially similar facts; rather, the question is whether the defendants had fair warning that their actions were unconstitutional." *Grawey*, 567 F.3d at 313-14 (internal quotations marks and citations omitted). Defendants are not entitled to qualified immunity, and their motion for summary judgment on Plaintiff's Fourth Amendment claim of excessive force is denied. Material issues of fact remain for trial on Plaintiff's excessive force claim.

**IV. Conclusion**

For the above-stated reasons, Defendants' motion for summary judgment is DENIED.


       s/Nancy G. Edmunds  
       Nancy G. Edmunds  
       United States District Judge

Dated: December 7, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 7, 2010, by electronic and/or ordinary mail.

        s/Carol A. Hemeyer
        Case Manager